IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TRAVIS A. C.,[1]                    )
                                    )
        Plaintiff,                  )
                                    )
vs.                                 )        Case No. 3:21-cv-403-DWD
                                    )
COMMISSIONER OF SOCIAL              )
SECURITY,                           )
                                    )
        Defendant.                  )

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423. For the following reasons, the final agency decision is due to be reversed.

## Procedural History

Plaintiff applied for DIB on September 12, 2019, alleging a disability onset date of September 10, 2015. After holding an evidentiary hearing, an Administrative Law Judge ("ALJ") denied the application on October 21, 2020. The Appeals Council denied Plaintiff's request for review on March 8, 2021, making the ALJ's decision the final agency decision subject to judicial review. Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## Applicable Legal Standards

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked

with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the Court takes the entire administrative record into consideration but does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. At step one, he determined that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. He was 26 years old on the alleged onset date. At step two, the ALJ found that Plaintiff has the following severe impairments: post-traumatic stress disorder ("PTSD"), depression, and bipolar disorder. The ALJ also found that Plaintiff has the following nonsevere impairments: obesity, hypothyroidism, gastroesophageal reflux disease ("GERD"), irritable bowel syndrome, hypogonadism, and migraines.

At step three, the ALJ found that Plaintiff does not have any impairments or combination of impairments that meet any of the listings. The ALJ determined that

Plaintiff has only a mild limitation in his ability to understand, remember, and apply information. (Tr. 24). He found that Plaintiff has a moderate limitation in his ability to interact with others. (Tr. 25). The ALJ also concluded that Plaintiff has only a moderate limitation in his ability to concentrate, persist, or maintain pace. (Tr. 25). Finally, the ALJ found that Plaintiff has a moderate limitation in his ability to adapt and mange himself. (Tr. 25).

Before proceeding to step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform work at all exertional levels but with the following nonexertional limitations:

> [He] can understand, remember, and carry out rote or routine instructions that require the exercise of little independent judgment or decision-making, but cannot do so for complex instructions. He can maintain concentration, persistence and pace sufficient for work with a variable pace or end-of-day production goals, but not for fast-paced work such as work at a moving conveyor belt. He can deal with changes in a routine work setting. He can occasionally interact with supervisors, co-workers, or the public. His job duties should primarily involve working with things rather than data or people.

(Tr. 26).

At step four, the ALJ relied on the testimony of a vocational expert ("VE") to find that Plaintiff could not perform any of his past relevant work. (Tr. 34). However, at step five, the ALJ found that Plaintiff was not disabled because he was able to do other jobs that exist in significant numbers in the national economy. (Tr. 35).

## The Evidentiary Record

Plaintiff was born on July 2, 1989. (Tr. 46). He is married and has three children: twin boys who were six years old at the time of the hearing and a girl who was three

years old at the time of the hearing. (Tr. 47). Plaintiff's wife works from home for a community mental health agency from 7:00 p.m. to 7:00 a.m. and assists Plaintiff with childcare. (Tr. 466, 7190). Plaintiff plays instruments, drives, and goes to car shows. (Tr. 66 & 273). He also attends church, shops with his wife, maintains an active checking account, and enjoys playing video games, watching television, and reading. (Tr. 272–73).

Plaintiff took some college courses but did not receive a degree or certificate. (Tr. 46). He served in the United States Army from 2008 to 2010. (Tr. 47). After leaving the Army, Plaintiff worked for a security company. (Tr. 52). Next, he worked at Walmart as a support manager. (Tr. 54). Then he worked for a different security company. (Tr. 55). More recently, Plaintiff was a residential supervisor for a brain injury rehabilitation facility. Then Plaintiff worked for the Department of Veteran Affairs ("VA") as a scheduler. (Tr. 59). In 2017 or 2018, he worked for a few months at an automotive repair business. (Tr. 48–49).

In 2015, two psychologists working for the VA examined Plaintiff as part of his application for VA benefits. Both K.F. Fair, Ph.D., and Jonathan Denham, Ph.D. concluded that Plaintiff has a level of occupational and social impairment that causes an "occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks." (Tr. 450 & 1320). Plaintiff now appears to receive 100% service-connected VA benefits and is considered by the VA to be unemployable. (Tr. 203).

Plaintiff was psychiatrically hospitalized in August 2018 after presenting to the emergency department with suicidal thoughts. (Tr. 540). He improved over the course of his hospitalization and was discharged in "improved-stable" condition. (Tr. 5241–45).

5

During an outpatient follow-up visit on November 14, 2018, Plaintiff reported having no health issues at that time. (Tr. 493). At an outpatient visit in April 2020, Plaintiff appeared with a depressed affect but denied thoughts of self-harm. (Tr. 7192). He also indicated that he does yard work to keep busy and listens to music. (Tr. 7190). In May 2020, Plaintiff reported continued symptoms of depression but indicated that his mood had improved since an adjustment in his medications. (Tr. 7179). On July 9, 2020, Plaintiff reported that he was doing well with his mental health treatment. (Tr. 7158). On July 15, 2020, Plaintiff reported sleeping poorly around the anniversary of a major trauma but was maintaining a "pretty good" mood. (Tr. 7147–49).

Two agency psychiatric consultants reviewed Plaintiff's medical records as part of the Commissioner's determination that Plaintiff is not disabled. Russell Taylor, Ph.D., performed his evaluation in December 2019, and Larry Kravitz, Psy.D. performed his evaluation in May 2020. Both Dr. Kravitz and Dr. Taylor indicated that Plaintiff has moderate limitations in his abilities to (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, (2) interact appropriately with the general public, (3) accept instructions and respond appropriately to criticism from supervisors, (4) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and (5) respond appropriately to changes in the work setting. (Tr. 96, 97 & 113). They also both concluded that Plaintiff had the mental capacity "to carry out one or two-step instructions for a normal work period." (Tr. 97 & 114).

During the evidentiary hearing, the ALJ presented the VE with a hypothetical person with limitations identical to those in the RFC. (Tr. 79). The VE testified a person with those limitations could not perform Plaintiff's past jobs. (Tr. 79). However, the VE also testified that a person with those limitations could perform other jobs that exist in significant numbers in the national economy. (Tr. 80). In response to the ALJ's follow-up questions, the VE testified that a person who could not respond appropriately to supervision, coworkers, and typical work situations would not be able to find work in the national economy. (Tr. 80–81). The VE also testified that there is typically zero tolerance for an employee who engages in aggressive behavior toward a supervisor or another coworker. (Tr. 82). Finally, the VE testified that a worker would not be permitted to be off task for more than ten percent of the day or to miss work two or more times each month for therapy or other medical treatments. (Tr. 81–82).

## Analysis

Plaintiff makes three arguments in support of reversal of the Commissioner's decision. Plaintiff first argues that the RFC is not supported by substantial evidence because it (1) omits the one-or-two-step-instructions limitation contained in the agency consultants' opinions; (2) does not incorporate the agency consultants' moderate, qualitative limitations on interactions with others; and (3) does not account for the VA psychologists' opinions as to his problems with persistence and pace. Second, Plaintiff argues that the ALJ selectively evaluated the evidence of Plaintiff's activities of daily living and his psychiatric symptoms. Finally, Plaintiff argues that the structure of the Social Security Administration is unconstitutional, a fact which would invalidate the

decision of the ALJ. The Court will consider each of these arguments in turn.

## A.    The RFC

Plaintiff correctly argues that the ALJ failed to adequately consider the opinions of the agency consultants when formulating the RFC. Both Dr. Kravitz and Dr. Taylor opined that Plaintiff could perform tasks involving "one or two-step instructions." (Tr. 97 & 114). The ALJ found the agency consultants' opinions "somewhat but not fully persuasive" (Tr. 33), yet he omitted the "one or two-step instructions" limitation from the RFC. The ALJ is required to explain why he adopted some of the agency consultants' opinions and rejected others. *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (citing S.S.R. 96-6p and 20 C.F.R. § 404.1527(f)). Here, the ALJ made no mention at all of the one-to-two-step-instructions limitation. The ALJ's failure to evaluate this aspect of the agency consultants' opinions constitutes an error. *See Diaz v. Berryhill*, No. 16 C 11419, 2017 WL 4163959, at *2 (N.D. Ill. Sept. 20, 2017) (finding ALJ erred when he gave some weight to state agency psychologists' opinions but did not explain why he rejected their "1–2 step job tasks" limitation).

Administrative error may be harmless and not require remand. *McKinzey*, 641 F.3d at 892. An ALJ's error is harmless if the court is "convinced that the ALJ will reach the same result" on remand. *Id.* Here, had the ALJ properly evaluated the one-to-two-step-instruction limitation, he either would have included the limitation in the RFC or not. If he had not included the limitation even after properly evaluating it, the outcome would be the same, because the ALJ did not include the limitation in the first instance. Alternatively, if he had included the limitation, the outcome may have been different.

8

The jobs that the ALJ found Plaintiff could perform all require Level 2 Reasoning. *See* U.S. EMP. SERV., DICTIONARY OF OCCUPATIONAL TITLES "Packager, Machine," No. 920.685-078; "Laundry Worker II," No. 361.685-018; "Packager, Hand," No. 920.587-018; "Cook Helper" 317.687-010 (4th ed. 1991). But one to two-step tasks are characteristic of Level 1 Reasoning. *Perry v. Colvin*, 945 F. Supp. 2d 949, 964 (N.D. Ill. 2013) (citing U.S. EMP. SERV., DICTIONARY OF OCCUPATIONAL TITLES Appendix C – Components of the Definition Trailer). Thus, the Court cannot say with confidence that the outcome would have been the same had the ALJ included the one-to-two-step-instruction limitation in the RFC. Therefore, the ALJ's error was not harmless.

Next, Plaintiff argues that the ALJ failed to adequately account for the agency consultants' opinions as to Plaintiff's moderate limitations in interacting with others. Both Dr. Kravitz and Dr. Taylor indicated that Plaintiff has moderate limitations in his abilities to (1) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, (2) interact appropriately with the general public, (3) accept instructions and respond appropriately to criticism from supervisors, (4) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and (5) respond appropriately to changes in the work setting. (Tr. 96, 97 & 113). As discussed above, the ALJ found the opinions of Dr. Kravitz and Dr. Taylor somewhat persuasive. He also concluded that Plaintiff has moderate limitations in his abilities to interact with others and maintain concentration, persistence, and pace. (Tr. 25–26). Yet, the RFC indicates that Plaintiff "can deal with changes in a routine work

setting [and] can occasionally interact with supervisors, co-workers, or the public," concluding that his "job duties should primarily involve working with things rather than data or people." (Tr. 26).

The RFC does not adequately capture the moderate interpersonal limitations described by the agency consultants. "An ALJ need not use 'specific terminology,' but we have 'repeatedly rejected the notion that a hypothetical . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019) (quoting *Yurt v. Colvin*, 758 F.3d 850, 858–59 (7th Cir. 2014)). As Plaintiff argues, simply limiting the duration and frequency of his interactions does not account for qualitative limitations in his ability to accept instructions and respond to criticism. *See Amanda S. G. v. Saul*, No. 1:18-CV-304, 2019 WL 4594605, at *4 (N.D. Ind. Sept. 23, 2019). The Commissioner argues that the RFC includes a qualitative limitation when it limits Plaintiff to primarily "working with things rather than data or people." Yet, as Plaintiff argues, this is simply another quantitative limitation that does not account for Plaintiff's moderate limitations in working with people no matter the duration. Further, the RFC directly contradicts the agency consultants by indicating that Plaintiff "can deal with changes in a routine work setting," when the consultants indicated he had moderate limitations in his ability to "respond appropriately to changes in the work setting." The ALJ was not required to accept the opinions of the agency consultants. But it was error to give those opinions partial weight and then exclude them from the RFC without explanation.

10

The record suggests that the ALJ's mistake was not harmless. During the hearing, the VE testified that a person who could not respond appropriately to supervision, coworkers, and typical work situations would not be able to find work in the national economy. (Tr. 80–81). The VE also testified that there is typically zero tolerance for an employee who engages in aggressive behavior toward a supervisor or another coworker. (Tr. 82). Given this testimony, information regarding the specific moderate limitations described by the state agency doctors may well have altered the VE's conclusions. Thus, the Court cannot say with confidence that the outcome would have been the same had the ALJ included the specific moderate limitations in interactions with others and concentrating, persisting, and maintaining pace. Therefore, the ALJ's error was not harmless.

Finally, Plaintiff takes issue with the ALJ's treatment of the opinions of Dr. Fair and Dr. Denham. Both psychologists concluded that Plaintiff experienced occasional decreases in workplace efficiency. The ALJ found this opinion to be consistent with the medical records and found their opinions as a whole to be partially persuasive. (Tr. 32). However, the ALJ did not reference the limitation of occasional decreases in workplace efficiency in the RFC and instead indicated that Plaintiff could meet end-of-day production goals, although not for fast-paced work. (Tr. 26). The ALJ also did not explain why that limitation was omitted from the RFC. The Commissioner argues that the evidence supports the ALJ's conclusion that Plaintiff could meet variable pace or end-of-day production goals. Even if the evidence supports the ALJ's conclusions, he erred by failing to adequately support his conclusions. *Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir.

2016).

This mistake was not harmless error. The VE testified that a worker would not be permitted to be off task for more than ten percent of the day. (Tr. 82). Under Social Security Act regulations, the term "occasional" means up to one-third of the workday. S.S.R. 83-10. These regulations do not apply to the opinions provided by VA psychologists, but the regulations strongly suggest that occasional decreases could amount to at least ten percent of the day off task. Thus, the Court cannot say with confidence that the outcome would be the same had the ALJ included this limitation in his hypothetical to the VE.

**B.     Evaluation of Plaintiff's Symptoms**

Next, Plaintiff argues that the ALJ's evaluation of Plaintiff's symptoms is not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ mischaracterized or omitted Plaintiff's reported daily activities in his decision. For example, Plaintiff points out that the ALJ relied on the fact that Plaintiff was the primary caregiver for his children during the day while his wife was at work. (Tr. 33). In fact, Plaintiff's wife worked from home during third shift—7:00 p.m. to 7:00 a.m.—and was therefore able to stay at home and assist with childcare. (Tr. 466, 7190). In response, the Commissioner notes that the ALJ acknowledged that Plaintiff's wife worked from home and assisted him with childcare. (Tr. 30).

Plaintiff points to other examples. The ALJ noted that Plaintiff plays instruments, drives, and goes to car shows. (Tr. 25 & 33). Plaintiff argues that the ALJ failed to acknowledge the qualification on these activities, namely that his problems with

concentration and anger limited his ability to engage in these activities. Yet, the ALJ did acknowledge that Plaintiff's problems with concentration limit his ability to read and play instruments and that his problems with anger limit his ability to drive. (Tr. 25). The ALJ evaluated these specific activities in context with several other self-reported activities of daily living, including attending church, shopping with his wife, maintaining an active checking account, playing video games, watching television, and reading. (Tr. 272–73). To the extent there is some contradiction among Plaintiff's self-reported activities of daily living, the ALJ must "decide the facts and resolve discrepancies." *Jeske v. Saul*, 955, F.3d 583, 592 (7th Cir. 2020). Here, substantial evidence supports the ALJ's evaluation of Plaintiff's self-reported activities of daily living and the ALJ's conclusion that Plaintiff's symptoms are not as debilitating as he claims.

Plaintiff also takes issue with the ALJ describing Plaintiff as in stable condition. As Plaintiff points out, a person could be stable in the sense that he is consistently in a terrible condition. However, the ALJ's evaluation of the medical evidence shows that he concluded Plaintiff was stable in a good condition. Substantial evidence supports the ALJ's conclusion. The ALJ acknowledged that Plaintiff was psychiatrically hospitalized in August 2018 after presenting to the emergency department with suicidal thoughts. (Tr. 540). He improved over the course of his hospitalization and was discharged in "improved-stable" condition. (Tr. 5241–45). During an outpatient follow-up visit on November 14, 2018, Plaintiff reported having no health issues at that time. (Tr. 493). At an outpatient visit in April 2020, Plaintiff appeared with a depressed affect but denied thoughts of self-harm. (Tr. 7192). He also indicated that he does yard work to keep busy

and listens to music. (Tr. 7190). In May 2020, Plaintiff reported continued symptoms of depression but indicated that his mood had improved since an adjustment in his medications. (Tr. 7179). On July 9, 2020, Plaintiff reported that he was doing well with his mental health treatment. (Tr. 7158). On July 15 2020, Plaintiff reported sleeping poorly around the anniversary of a major trauma but was maintaining a "pretty good" mood. (Tr. 7147–49). There is substantial evidence showing that Plaintiff's condition was stable and even improved following his psychiatric hospitalization in 2018.

Plaintiff also argues that the ALJ should have given more weight to the fact that Plaintiff has 100% service-connected VA benefits. The ALJ should give the VA's determination of disability at least some weight. *Allord v. Barnhart*, 455 F.3d 818, 820 (7th Cir. 2006). But as discussed in the previous paragraph, there is substantial evidence that Plaintiff has been in stable and at times improving condition due to his treatment. The ALJ's thorough review of Plaintiff's reported activities of daily living also provide substantial evidence that his is not disabled.

## C.    Separation of Powers

Finally, Plaintiff argues that the structure of the Social Security Administration is constitutionally defective. He relies on the Supreme Court's ruling in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020). In *Seila Law*, the Supreme Court held that Congress could not limit the President's ability to remove the Director of the Consumer Financial Protection Bureau without cause. 140 S. Ct. at 2197. Plaintiff argues that the ruling in *Seila Law* also applies to 42 U.S.C. § 902(a)(3), which limits the President's ability to remove the Commissioner of the Social Security Administration

without cause. According to Plaintiff, this alleged unconstitutionality would invalidate the ALJ's ruling regarding Plaintiff.

The Commissioner agrees that 42 U.S.C. § 902(a)(3) is unconstitutional to the extent that it limits the President's ability to remove the Commissioner without cause. (Doc. 29 at 2). However, as the Supreme Court explained in *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021), a constitutional defect in the President's ability to *remove* an agency director does not undermine the authority of actions taken by a properly *appointed* director. In *Collins*, that means that there was "no basis for concluding that any head of the [agency] lacked the authority to carry out the functions of the office." *Id.* at 1788. The same logic applies to decisions rendered by ALJs appointed by the Commissioner of the Social Security Administration. *See id.* at 1802 (Kagan, J., concurring in part and concurring in the judgment) ("But given the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone."). Because Plaintiff has failed to demonstrate any connection between the limitation on the President's removal power and the denial of his application for disability benefits, this argument fails.

## Conclusion

The final decision of the Commissioner of Social Security denying Plaintiff's application for social security benefits is **REVERSED and REMANDED** for further proceedings consistent with this Order. Additionally, on remand, the ALJ deciding the case shall provide a thorough evaluation of the agency consultants' opinions, explaining why he or she is adopting or rejecting each relevant aspect of those opinions. The ALJ

15

shall also ensure that the RFC and any hypothetical presented to the VE are consistent with the opinions of the agency consultants and other medical professionals, to the extent that the ALJ credits those opinions.

The Clerk of Court is directed to enter judgment in favor of Plaintiff Travis A. C.

**SO ORDERED.**

Dated: May 5, 2022

_____
DAVID W. DUGAN
United States District Judge

16